UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 06 CR 50055 |
| | ) | |
| CORVET T. WILLIAMS and | ) | |
| BRIAN D. AUSTIN, | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM OPINION AND ORDER

FREDERICK J. KAPALA, District Judge:

In October 2007, a jury found defendants, Brian D. Austin and Corvet T. Williams, guilty of two counts of bank robbery, in violation of 18 U.S.C. § 2113(a), (d), and two counts of carrying firearms during a crime of violence, in violation of 18 U.S.C. § 924(c)(1). Austin and Williams were sentenced to prison terms of 648 months and 646 months' respectively. The Seventh Circuit reversed and remanded for a new trial, finding that the court abused its discretion in denying defendants' motion to continue the trial. United States v. Williams, 576 F.3d 385 (2009). On remand, Austin for the first time has moved to suppress any and all evidence the police seized from the apartment he shared with his girlfriend. The parties have filed written briefs and the court has held an evidentiary hearing. For the following reasons, the motion to suppress is granted.

I. FACTS

On August 23, 2006, two armed men wearing ski masks and gloves robbed the Alpine Bank branch located within a supermarket in Rockford, Illinois. The shorter gunman jumped over the

counter and removed $12,428 from the cash drawers while the taller gunman held bank employees and customers at gunpoint. On September 5, 2006, two gunman of the same description relieved the Associated Bank in Rockford of $13,777.48 under nearly identical circumstances.

At the evidentiary hearing on defendant's motion to suppress, Sergeant Kurt Whisenand testified that he was in charge of the investigation of the Associated Bank robbery. Whisenand explained that Officer Joe Danforth had received information from an informant that Christian Chandler's brother, who goes by "BJ," later determined to be Austin, and another person who goes by "Fat Trav," later determined to be Williams, were responsible for the robbery of the Alpine Bank. Whisenand assigned Detectives Howard Forrester and Kevin Ogden to surveil the apartment building at 2740 City View Court because they had information from previous investigations that Austin's girlfriend, Chianta Jefferson, lived there. Whisenand agreed that they had no information that Austin was actually present at the apartment building. Whisenand also assigned Detective Torry Regez to look up any old cases that had not been reviewed by the State's Attorney's Office to see if there were any charges that could be brought against the suspected bank robbers. Whisenand explained that they did not seek arrest warrants for Austin and Williams based on the bank robberies because they did not have enough evidence. In Whisenand's judgment they did, however, have good information that Austin and Williams had committed "two violent, middle of the day, takeover style robberies," and he felt that they needed to get these dangerous individuals into custody to prevent future robberies. Prior to September 6, 2006, Whisenand was not aware that Austin was on parole.

Detective Forrester testified that, on September 6, 2006, he and other detectives were assigned to conduct surveillance at 2740 City View Court and to attempt to locate Jefferson. At that time, Forrester was not aware that Austin was on parole and he did not know Austin's whereabouts.

2

Forrester and Ogden arrived at 2740 City View Court in an unmarked police vehicle. Detectives Scot Mastroianni and Mark Jimenez arrived in a second vehicle. Forrester observed a female who matched the description of Jefferson walk out to a Ford Explorer. Forrester and Ogden followed the Explorer and ran the license plate which came back registered to Chianta Jefferson of Bayliss Avenue, Rockford. Forrester and Ogden followed Jefferson's Explorer and executed a traffic stop. Forrester agreed that he did not observe Jefferson commit any traffic infractions, was not aware of any warrants for her arrest, and did not believe that she had committed, was committing, or was about to commit a crime. When asked what the reason was for pulling Jefferson over, Forester said, "[w]e wanted to speak to her about the incident involving an attempt to locate Brian Austin."

Forester approached the Explorer and told Jefferson that they wanted to talk to her in reference to an incident that had happened. Jefferson asked if she was in any trouble. Jefferson was informed that she was not in any trouble but that they needed her cooperation and for her to be truthful. Forrester and Ogden asked Jefferson if she would accompany them to the Public Safety Building (PSB) and Jefferson said that she would. The Explorer was left parked in a Wal-Mart parking lot and Jefferson rode with Forrester and Ogden in their police vehicle. Forrester testified that Jefferson was not placed in handcuffs and was not under arrest. Forrester or Ogden asked Jefferson who else was at the apartment, and she stated that Austin was there. At that point, Ogden called Whisenand and informed him that Austin was at 2740 City View Court. When Jefferson overheard Ogden on the phone, she said, "if it's Brian Austin you want to talk to, then I'll take you up to the apartment, I'll let you in, and you all can talk to him about anything you want." With that, Forrester, Ogden, and Jefferson returned to the parking lot at 2740 City View Court where Ogden filled out a consent to search form, read it to Jefferson, and Jefferson signed the form at 9:35 a.m.

Forrester denied telling Jefferson that if she did not sign the form they would go into the apartment anyway even if they had to break the door down. The consent form provides:

> I, Chianta A. Jefferson, knowingly and voluntarily give consent to City of Rockford police officers to conduct a complete search of the following:
> . . .
> Apartment/House, located at 2740 City View Court #301
> . . .
> These officers are authorized by me to seize property which they determine may pertain to a criminal investigation they are conducting. I understand and have been informed by at least one of the undersigned officers that I have a right to refuse this consent.

According to Forrester, Jefferson used her key to unlock the door of apartment 301, allowing approximately 6 or 7 officers to enter.

Detective Ogden testified that he and Forrester were assigned to surveil the apartment building at 2740 City View Court as a whole because they did not know which apartment belonged to Jefferson. Ogden testified that he may have known that Austin was on parole at the time, but he could not recall. Prior to pulling Jefferson over with the aid of his police car's lights, Ogden did not observe Jefferson commit any traffic infraction, and he did not think that she had committed, was committing, or was about to commit a crime. The traffic stop occurred at approximately 9:15 or 9:20 a.m. When asked why they pulled Jefferson over, Ogden said, "[t]o find out if it was Chianta Jefferson and interview her about this bank robbery the day before." Ogden said that Jefferson was asked if she would come to the PSB and she agreed. Ogden admitted that he learned at some point that Jefferson was on her way to pick up her sister and take her to school and was then going to a meeting for work. Ogden described the circumstance of Jefferson overhearing him say "B.J." and Jefferson informing them that if they wanted to talk to Austin he was at her apartment. Ogden said that he did not know which apartment Austin was in until Jefferson told him. Ogden also said that

4

no one told Jefferson that they would break down her door or that there would be consequences if she did not give consent.

Detective Regez testified that on September 5, 2006, he reviewed police records and located a June 25, 2006 police report involving Austin. Regez became aware that Austin was on parole while checking records. Regez said that he did not know if he told the other detectives about Austin's parole status, but that he thought it was known to everyone because he was sure that other detectives ran Austin's name. On September 6, 2006, Regez reviewed the police report with an assistant state's attorney, after which a judge issued an arrest warrant for Austin at 9:30 a.m. Once Regez acquired the arrest warrant, he advised Whisenand who, Regez assumed, advised the other detectives.

Detective Mastroianni testified that on September 6, 2006, he and Detective Jimenez were assigned to conduct surveillance at 2740 City View Court, which was the residence of Austin's girlfriend, Jefferson. Mastroianni became aware that Austin was present in Jefferson's apartment only after Forrester and Ogden stopped her and she informed them that Austin was there. Mastroianni said that they knew apartment 301 belonged to Jefferson, but he did not remember how they learned this information. Before Ogden and Forrester came back to 2740 City View Court with Jefferson, Mastroianni and Jimenez approached the door of apartment 301 and knocked. Mastroianni and Jimenez heard a male voice call out, "who's there." The detectives responded "Rockford Police," but heard nothing in reply. Mastroianni testified further that they entered the apartment 10 or 15 minutes later when Jefferson unlocked the door with her key. Mastroianni believed that he became aware that Austin was on parole when Regez informed him, but he could not remember exactly when that took place.

Detective Jimenez testified that, when he and the other detectives were assigned to surveil 2740 City View Court, they did not know which apartment was Jefferson's and it was only a possibility that Austin would be present at the apartment. While Jimenez and Mastroianni were conducting surveillance, Whisenand informed Mastroianni by phone that Regez had obtained an arrest warrant for Austin. Jimenez said that they were eventually told that Austin was in apartment 301, but he did not remember if that information was conveyed in the same phone call. Before Forrester and Ogden returned with Jefferson, Jimenez and Mastroianni knocked on the door of apartment 301. Someone came to the door and asked who it was, the detectives identified themselves as police officers, and that was the end of the conversation. No one opened the door, and the person walked away from the door. Jimenez and the other detectives entered the apartment after Jefferson returned and opened the door with her key. At no time on September 6, 2006, was Jimenez aware that Austin was on parole.

Jefferson testified that, in September 2006, she lived with her boyfriend, Brian "B.J." Austin, at 2740 City View Court, Apartment 301. On the morning of September 6, Jefferson left her apartment to pick up her sister and take her to school, and then to attend a meeting for work. Jefferson said that two detectives pulled her over near Wal-Mart. Jefferson asked the detectives what she did wrong, and they said that they needed her driver's license, to get off the phone, and that they had reason to believe that she had a certain person at her apartment. According to Jefferson, the detectives asked her to come downtown with them. Jefferson said that she had things to do and would come downtown when she was finished. The detectives told Jefferson that she had to come downtown now and if she did not there would be consequences. Jefferson asked if she was under arrest, and the detectives said that she was not. Jefferson said that the detectives made her park her

6

car in the Wal-Mart parking lot and get into their car. Jefferson testified that she believed that she had no choice but to go with the detectives.

Jefferson testified further that while riding in the police car, the detectives told her that if she did not tell them whether someone was in her apartment she would get into trouble. Jefferson told them that Austin was in her apartment. The detectives told Jefferson that Austin might know something about a bank robbery and that they needed to talk to him. With that, one of the detectives made a call and they went to Jefferson's apartment. The detectives asked Jefferson to go upstairs, open the door, and call out Brian's name. Jefferson refused. The detectives told Jefferson that she had to sign a piece of paper saying that they could go into the apartment. Jefferson asked if they were going to search her apartment because she did not want them tearing up her house. The detectives told her no, that is not what the paper meant. When Jefferson asked why the paper said search, one of the officers said that if she wanted to be an ass about it she would be in trouble and that they would go in anyway. As a result, Jefferson felt that she had no choice and signed the paper. Jefferson said that an officer took her keys, opened the door, and the officers entered the apartment.

It is undisputed that in September 2006, Austin was on mandatory supervised release (MSR) (commonly referred to as parole) from the Illinois Department of Corrections. One of the conditions of Austin's "Parole or Mandatory Supervised Release Agreement"[1] (MSR agreement) provided: "[y]ou shall consent to a search of your person, property, or residence under your control."[2] The parole agreement was signed by Austin on April 18, 2006.

---

[1] This document was government's exhibit A at the evidentiary hearing on defendant's motion to suppress.

[2] This is a required condition of every parole and mandatory supervised release in the State of Illinois. See 730 ILCS 5/3-3-7(a)(10).

## II. DISCUSSION

In his motion to suppress, Austin argues, among other things, that the consent to enter and search the apartment was unlawful because it was the result of the illegal seizure and detention of Jefferson. The government concedes that the traffic stop was unlawful, but argues that Jefferson's consent was sufficiently attenuated from the unlawful stop such that the taint of that illegality was purged. Alternatively, the government argues that the detectives conducted a lawful parole search of Austin's residence.

### A. Attenuation from the Illegal Traffic Stop

Because the government concedes that the traffic stop was an unlawful seizure of Jefferson, the court must determine if Jefferson's subsequent written consent to a search of her apartment was the product of that illegality. It is important to understand that even if a consent to search is voluntary, it is still invalid unless the taint of the preceding illegality is sufficiently purged. United States v. Robeles-Ortega, 348 F.3d 679, 681 (7th Cir. 2003); 4 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 8.2(d) at 76 (4th ed. 2004) ("[T]he evidence obtained by the purported consent should be held admissible only if it is determined that the consent was both voluntary and not an exploitation of the prior illegality."). In this case, even crediting the detectives' testimony and assuming without deciding the voluntariness of the consent, the government has failed to demonstrate attenuation sufficient to purge the taint of the unlawful traffic stop.

"[C]onsent given during an illegal detention is presumptively invalid, and any evidence discovered in a subsequent search is inadmissible unless the taint of the illegal conduct is somehow dissipated." United States v. Johnson, 427 F.3d 1053, 1056 (7th Cir. 2005). The following factors

8

are utilized to determine whether the taint of a prior illegality was dissipated: "(1) the temporal proximity of the illegal entry and the consent, (2) the presence of intervening circumstances, and, particularly, (3) the purpose and flagrancy of the official misconduct." Robeles-Ortega, 348 F.3d at 681 (citing Brown v. Illinois, 422 U.S. 590, 603-04 (1975)). Courts place a heavy burden on the government to show that the acquisition of evidence pursuant to consent is purged of the taint of an antecedent illegal seizure. United States v. Jerez, 108 F.3d 684, 695 (7th Cir. 1997). There is a strong body of case law in this circuit and in other circuits holding that voluntary consents following illegal stops, detentions, or arrests are typically tainted. Id.

With respect to the first Brown factor, the government has failed to convince this court, through citation to analogous authority or otherwise, that the 15 or 20 minutes which elapsed between the unlawful traffic stop and Jefferson's consent is a sufficient amount of time to purge the unlawful taint of the preceding illegal seizure. See Taylor v. Alabama, 457 U.S. 687, 691 (1982) (holding that taint was not purged even though six hours passed between illegal arrest and confession); United States v. Richardson, 949 F.2d 851, 859 (6th Cir. 1991) (holding that consent given 20 minutes into illegal arrest and detention in a police car was tainted); United States v. George, 883 F.2d 1407, 1416 (9th Cir. 1989) (holding that consent was the fruit of the poisonous tree where less than an hour intervened). Therefore, the 15 or 20 minutes that elapsed between the unlawful seizure and the consent does not support a finding that the illegality was sufficiently purged.

With respect to the second Brown factor, the government argues that there were two intervening events which purged the unlawful taint: Jefferson's agreement to accompany the officers to the PSB, and her volunteering of the information that Austin was at her apartment. The agreement

9

to accompany the officers to the PSB came almost immediately after the unlawful traffic stop and was preceded only by a short conversation with the detectives wherein the detectives told Jefferson that she was not in trouble but that they needed her cooperation. Jefferson's decision to go with the detectives while she was being unlawfully detained, and only minutes after the unlawful traffic stop, was causally connected to her illegal detention and therefore was a fruit of that illegality. See Jerez, 108 F.3d at 695 ("[A] short conversation was all that occurred between the two events, and that short conversation was part of the "res gestae" of obtaining the consent to search. Moreover, no intervening event of any significance occurred between the illegal seizure and the consent to break the causal chain."). The court notes that neither Forrester nor Ogden testified that they told Jefferson she did not have to accompany them to the PSB, nor did they give Jefferson the option of driving herself to the PSB. See United States v. Fernandez, 18 F.3d 874, 882 (holding that informing driver that he is free to go is an important factor in the analysis). Because there are no facts in the record which indicate that a reasonable person in Jefferson's position would have concluded that she was free to leave, the court cannot conclude that the unlawful seizure and detention became a voluntary encounter when Jefferson got into the police vehicle. See United States v. Mendenhall, 446 U.S. 544, 554 (1980) (holding that a person is "'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave"). Therefore, Jefferson's purported agreement to accompany the detectives was not an intervening event that broke the causal chain and purged the taint of the illegality. See Johnson, 427 F.3d at 1057 ("[T]he unlawful seizure was ongoing when Johnson voiced his consent, foreclosing the possibility that the consent was sufficiently attenuated from the unlawful conduct as to purge the taint.").

10

The government also has not persuaded the court that the causal connection between the illegal traffic stop and Jefferson's consent was broken by Jefferson's revelation of Austin's whereabouts while she rode in the back of the detectives' police vehicle. See Robeles-Ortega, 348 F.3d at 683-84 (noting circumstances that previously have been considered sufficient intervening events including arraignment, release from custody, and discovery of other incriminating evidence causing defendant to confess). The parties dispute whether Jefferson volunteered Austin's whereabouts or if she did so as a result of the detectives' questioning. In any event, even if Jefferson was unprompted and blurted out the information, the fact remains that she did so while unlawfully detained, and, therefore, it was the fruit of the illegal traffic stop. Thus, on this record, the court concludes that the government has failed to carry its burden of demonstrating that there were intervening circumstances which broke the causal connection between the illegal traffic stop and the consent to search the apartment.

As for the third Brown factor, the government argues that the detectives' purpose in stopping Jefferson was to talk to her about her knowledge of the bank robbery, not to obtain her consent to search the apartment. This purpose does not mitigate the obvious unlawfulness of the traffic stop and fails to demonstrate any good faith on the part of the detectives. Two veteran detectives testified that they did not observe Jefferson commit any traffic infractions, were not aware of any warrants for her arrest, and did not believe that she had committed, was committing, or was about to commit a crime, but that they stopped her simply because they wanted to speak to her. Given the obvious nature of the constitutional deficiency of this traffic stop, the official misconduct at issue in this case was glaring. See Richardson, 949 F.2d at 859 (noting that the taint was significant because the constitutional violation was blatant); George, 883 F.2d at 1416 (noting the flagrancy of the officer's

11

conduct).  "When police purposely effect an illegal arrest or detention in the hope that custodial interrogation will yield incriminating statements, the deterrence rationale for application of the exclusionary rule is especially compelling."  United States v. Perez-Esparza, 609 F.2d 1284, 1289 (9th Cir. 1980) (citing Brown, 422 U.S. at 600-01, 605 (Powell, J., concurring in part)).  Therefore, the third Brown factor also weighs in favor of concluding that the illegality was not purged at the time of the consent.

Based on the foregoing analysis, the court concludes that all three Brown factors dictate a finding of no attenuation.  Consequently, the entry and search of apartment 301 was not lawful based on Jefferson's consent because the consent was the fruit of the illegal traffic stop.[3]

## B. Parole Search

In the alternative, the government maintains that the MSR agreement subjected defendant to a suspicionless search of his residence by law enforcement.  The government argues that defendant had no reasonable expectation of privacy in his residence and, therefore, the search did not violate his Fourth Amendment rights.

In Samson v. California, 547 U.S. 843 (2006), the court held that a condition of release can so diminish or eliminate a released prisoner's reasonable expectation of privacy that a suspicionless search by a law enforcement officer would not offend the Fourth Amendment.  Id. at 847.  In so holding, the Court found that "[e]xamining the totality of the circumstances pertaining to petitioner's

---

[3]This conclusion also vitiates the possibility that the officers lawfully entered the apartment to serve the arrest warrant on Austin pursuant to the rule stated in Payton v. New York, 445 U.S. 573 (1980).  "[F]or Fourth Amendment purposes an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within."  Id. at 603.  At the time they entered apartment 301, the officers had obtained a warrant for Austin's arrest, but they only learned which apartment Austin was in, and that he was present, through Jefferson, a tainted source.

status as a parolee, an established variation on imprisonment, including the plain terms of the parole search condition, we conclude that petitioner did not have an expectation of privacy that society would recognize as legitimate." Id. at 852 (citations and quotation marks omitted). On the other side of the Fourth Amendment scale, the Court found that the State of California's interests in supervising parolees, reducing recidivism, and reintegrating parolees into society was substantial. Id. at 853.

In People v. Wilson, 228 Ill.2d 35 (2008), the Illinois Supreme Court considered the Illinois parole search condition (the same one at issue in this case) in light of Samson. The Court held that the parole system in Illinois and the language of Illinois' parole search condition were not significantly different from California's parole system and parole search condition which were at issue in Samson. Id. at 48-49. With regard to the differing language, the Illinois Supreme Court wrote:

> We recognize the distinct wording in each search condition, but hold that the differences are of form, and not substance. In each state, the parolee is obligated to comply with the search demands of law enforcement officers or face potential revocation of parole. Despite defendant's protestations to the contrary, the legal and practical effect of his search condition is no different from that of the search condition at issue in Samson.

Id. at 49. Consequently, the Illinois Supreme Court held that Samson controlled their analysis of the Illinois parole search condition and it was reasonable under the Fourth Amendment. Id. at 52.

The government argues that in order to challenge the search of his residence, Austin must first establish that he had an expectation of privacy that society recognizes as legitimate. Essentially, the government argues that Austin, as a parolee, lacks standing to challenge the search of apartment 301 because he had no expectation of privacy in his parole residence whatsoever. That, however,

13

is not what the court held in <u>Samson</u>. Although the Court did say that "petitioner did not have an expectation of privacy that society would recognize as legitimate," <u>Samson</u>, 547 U.S. at 852, the Court went on to balance the parolee's expectation of privacy against the State of California's interest in conducting suspicionless searches of parolees. <u>Id.</u> at 853. Moreover, the Court specifically explained in the opinion that it was not concluding that parolees have no expectation of privacy:

> Nor, as the dissent suggests, do we equate parolees with prisoners for the purpose of concluding that parolees, like prisoners, have no Fourth Amendment rights. That view misperceives our holding. If that were the basis of our holding, then this case would have been resolved solely under <u>Hudson v. Palmer</u> and there would have been no cause to resort to Fourth Amendment analysis.

<u>Id.</u> at 850 n.2 (citations omitted). Therefore, this court cannot conclude that the search was lawful simply because Austin was on parole and his MSR agreement contained a parole search condition.

The flaw in the government's argument is that its analysis is incomplete. It is true, as the government suggests, that in order for a lawful parole search to exist the person who is implicated in the search must be on parole and his MSR agreement must contain an applicable search condition. The government fails to recognize, however, that there is a knowledge component to a valid parole search, that is, the officers conducting the search must have knowledge of the elements that validate the search. In order to satisfy the knowledge component in this case, the government must show that the officers had knowledge of the following three things: (1) Austin was on parole, (2) his MSR agreement contained a search condition; and (3) apartment 301 was Austin's residence.

Regarding the first knowledge requirement, while the question of whether the police knew the defendant was on parole was not directly addressed in <u>Samson</u>, the court did note that "[u]nder California precedent, . . . an officer would not act reasonably in conducting a suspicionless search

absent knowledge that the person stopped for the search is a parolee." Id. at 856 n.5. Moreover, it is clear that the officer in Samson was aware that Samson was on parole. Id. at 846; see also Moreno v. Baca, 431 F.3d 633, 639 (9th Cir. 2005) (holding that parole search cannot be considered reasonable if the officer is unaware of the parole status).

With respect to the second knowledge requirement, the courts that have addressed the issue have concluded that law enforcement officers cannot lawfully search a parolee's or probationer's person, property, or residence based solely on a probation or parole search condition of which they are unaware. United States v. Caseres, 533 F.3d 1064, 1075-76 (9th Cir. 2008) (rejecting government's argument that search of parolee's car could be justified after the fact as a parole search where there was insufficient evidence that the officer was aware of the search condition); New v. Perry, No. 2:07-cv-723, 2009 WL 483341, at *9 (S.D. Ohio Feb. 25, 2009) (holding that the search condition found in probation order did not justify the officers' search of probationer's person given the fact that they were unaware of his probation status or the search condition at the time of the search); Fenton v. State, 154 P.3d 974, 981 (Wyo. 2007) (holding that district court erred in denying a motion to suppress by relying on terms of a probation agreement of which police officers were unaware). This court has not been directed to any contrary authority.

As to the third knowledge requirement, it stands to reason that if an officer must have knowledge that an individual is on parole and subject to a search condition before being allowed to execute a valid parole search, then likewise the officer must know that the residence to be searched is that of the parolee before he can lawfully search the residence pursuant to a parole search condition. This conclusion is consistent with the general proposition that "almost without exception in evaluating alleged violations of the Fourth Amendment the Court has first undertaken an objective

15

assessment of an officer's actions in light of the facts and circumstances then known to him." Scott v. United States, 436 U.S. 128, 137 (1978).

In this case, there is evidence that at least one detective, Regez, learned that Austin was on parole before the search. Regez' knowledge could be imputed to the other officers through the collective knowledge doctrine. See United States v. Natzger, 974 F.2d 906, 912-13 (7th Cir. 1992). Consequently, the first knowledge requirement of a parole search is satisfied.

However, at the evidentiary hearing, Regez did not explain the nature of the parole record he discovered or what information the record contained. As such, even though the search condition is a mandatory parole condition under Illinois law, there is no evidence in this record that the detectives were aware that Austin's MSR agreement included a search condition. As far as the evidence at the evidentiary hearing reveals, the officers' did not know at the time whether Austin was placed on parole before Illinois law required the parole search condition, whether he was on parole from a different state that did have a parole search condition, or whether the search condition, though mandated by law, was omitted from Austin's MSR agreement. See Caseres, 533 F.3d at 1076 (noting similar deficiencies). As such, there is no evidence to satisfy the second knowledge requirement.

There is also no evidence that any detective had knowledge that apartment 301 was Austin's residence. Neither defendant's concession at the evidentiary hearing nor the statement in his motion to suppress that his address was 2740 City View Court, Apartment 301, changes this circumstance. The detectives only learned of Austin's presence in apartment 301 from Jefferson, a tainted source. In any event, there was no indication that Jefferson informed the detectives that apartment 301 was Austin's residence. Therefore, there is also no evidence to satisfy the third knowledge requirement.

16

Moreover, the collective actions of the detectives on September 6, 2006, also demonstrates that they were not aware of the parole search condition or Austin's address. Had the officers actually been aware of those facts, they would have proceeded directly to Austin's residence and searched it pursuant to the parole search condition. There would have been no need to surveil the building or pursue Jefferson in order to learn the apartment number and attempt to secure her consent to search the apartment. For these reasons, the entry and search of the apartment cannot be justified as a lawful parole search.

### III. CONCLUSION

The detectives were without a search warrant authorizing them to enter and search apartment 301. Having rejected both the government's arguments in support of its position that the detectives entered and searched lawfully, the court grants defendant's motion to suppress. The evidence seized from the apartment is suppressed.

Date: April 8, 2010                                             ENTER:

FREDERICK J. KAPALA
District Judge